DECISION
Plaintiff appeals the real market value of residential property identified as Account 1652294 (subject property) for the 2010-11 tax year. A trial was held on September 27, 2011, via telephone at the Oregon Tax Court, Salem, Oregon. David E. Carmichael, Attorney at Law, represented Plaintiff. Gregory Brashnyk, Jr. (Brashnyk) and Bryce Krehbiel (Krehbiel), Defendant's representative, testified on behalf of Plaintiff. Krehbiel, Residential Appraiser, Lane County Assessment and Taxation, appeared on Defendant's behalf.
Plaintiff's Exhibits 1-1 through 1-16 and Defendant's Exhibits A through S were received without objection. Both parties agreed that Defendant's Exhibit L was not a good comparable to the subject property because Exhibit L was categorized as a "Class 5" property and the subject property and all other comparable properties were categorized as "Class 4 ."
The parties requested that the record remain open until October 10, 2011, to receive Plaintiff's Rebuttal Exhibit 1, Defendant's Response, and Plaintiff's Reply. Plaintiff's Rebuttal Exhibit 1, filed on September 29, 2011, was a three-page Oregon Department of Revenue memorandum dated January 21, 2009. Defendant's Response was filed on October 4, 2011. Plaintiff's Reply was filed on October 5, 2011, requesting that paragraphs three, four, five and six of Defendant's Response be stricken because those paragraphs were outside the limits and scope *Page 2 
of Plaintiff's Rebuttal Exhibit 1. Plaintiff's Rebuttal Exhibit 1 and Defendant's Response were received and Plaintiff's objection to Defendant's Response was noted.
 I. STATEMENT OF FACTS
The subject property is a two-story, 3,100 square foot home located on 0.12 acres of land in Springfield, Lane County, Oregon. (Ptf's Ex 1 at 2.) The subject property's improvement is a house with a finished basement of 1,322 square feet, a main level of 1,484 square feet, and an upper level of 294 square feet. (Id.) The house has four bedrooms, four bathrooms, a three-car garage, three gas fireplaces, bay windows, skylights, and vaulted ceilings. (Id.) The house was built in 2003 and when listed for sale it was described as "[b]eing sold as i s" and "need[ing] a little TLC [tender loving care]." (Id.)
Plaintiff purchased the subject property from Deutsche Bank National Trust Company (Bank) on May 3, 2010, paying $247,500. (Ptf's Ex 1 at 3-7; Def's Ex P.) Plaintiff testified that the house was on the market from July 3, 2005, until his purchase date, and during that period of time, the listing price had declined at regular intervals from an initial listing price of $495,000 to a final listing price of $273,900 on March 1, 2010. (Ptf's Ex 1 at 8-10.) Plaintiff testified that the sale was not a "short sale," supporting his conclusion with the Regional Multiple Service listings for the subject property. (Ptf's Ex 1 at 2.) Plaintiff stated that he "felt [he] overpaid on this home by $22,500.00 due to market conditions." (Id. at 1.) Plaintiff testified that the subject property had multiple defects including warped floors, cracks in the retaining wall, and broken fireplaces resulting in a reduced real market value due to deferred maintenance. Plaintiff further testified that the retaining wall would cost approximately $40,000 to fix and that he had already spent between "$8,900 and $9,300 on repairs to the house." Plaintiff also testified that the property was "functionally obsolete" due to the majority of the bedrooms being located in the basement, *Page 3 
resulting in heating and natural lighting problems.
The subject property's real market value on the tax roll as of the January 1, 2010, assessment date was $395,997. (Ptf's Compl at 2.) Plaintiff filed a petition to appeal the subject property's real market value to the Board of Property Tax Appeals (BOPTA), which on March 4, 2011, reduced the real market value to $316,200. (Ptf's Compl at 2; Def's Ex C.) Plaintiff timely appealed BOPTA's order. (Ptf's Compl at 1.)
At trial, Plaintiff requested a 2010-11 real market value of $250,000. Plaintiff testified that the requested real market value is the May 5, 2010, purchase price ($247,500) adjusted to the assessment date using the same 0.5 percent per month time trending factor as used by Krehbiel. Plaintiff stated that the requested real market value is supported by his 32 years of experience selling real estate and the Regional Multiple Listing Service report that showed a decline in the listing value of the subject property from July 3, 2005, until the sale date.
Plaintiff submitted three comparable sales taken from the Regional Land Information Database of Lane County. (Ptf's Ex 1 at 16.) Plaintiff selected comparable properties sold between December 30, 2010, and June 27, 2011, based on proximity (0.5 miles) and similarity in square feet (within 15%) to the subject property. (Id.) Plaintiff's comparable #1 was a 2,934 square foot, three-bedroom, two-bathroom home on a 0.14 acre lot. (Id.) The home was built in 2004, sold for $286,000 on May 9, 2011, and was located 0.14 miles from the subject property. (Id.) Plaintiff's comparable #2 was a 3,258 square foot, five-bedroom, three-bathroom home on a 0.13 acre lot. (Id.) The home was built in 2003, sold for $319,700 on June 27, 2011, and was located 0.06 miles from the subject property. (Id.) Plaintiff's comparable #3 was a 2,643 square foot, four-bedroom, two-bathroom home on a 0.16 acre lot. (Id.) The home was built in 2003, sold for $256,500 on December 30, 2010, and located 0.l0 miles from the subject property. (Id.) *Page 4 
Plaintiff stated that the average value of the comparable properties is $287,400 and the median value is $286,000. (Id.) Plaintiff also showed that the comparable properties' price per square foot was $97 to $98. Krehbiel testified that all of Plaintiff's comparable properties were bank sales and acknowledged that Plaintiff's comparable #3 was also Defendant's comparable #5. Krehbiel testified that Plaintiff's comparables #1 and #2 sold "too late" to be considered for the January 1, 2010, assessment date.
Krehbiel determined a real market value for the subject property of $316,200. (Def's Exs C, S.) Krehbiel testified that the subject property was bank-owned at the time Plaintiff purchased it and as a result, Plaintiff's transaction was not indicative of an "arm's-length sale." Krehbiel testified that properties purchased from banks are typically purchased at a discount from real market value. Krehbiel testified that "such sales are considered foreclosure sales." Krehbiel provided reports from RealtyTrac and Ourbroker.com showing that foreclosures in Oregon typically have sale prices averaging 30.43% less than real market value, and that 33% of Oregon home purchases are foreclosed properties. (Def's Exs D at 4, F at 3.)
Krehbiel submitted five comparable properties based on sale date, sale price, classification, square feet, and proximity to the subject property. (Def's Exs G-K, M.) Comparable #1 was a 3,060 square foot, eight-bedroom and four-bathroom home on a 0.14 acre lot. (Def's Ex G.) Comparable #1 was built in 2003 and sold for $319,000 on October 16, 2009. (Id.) Comparable #2 was a 2,494 square foot, three-bedroom and three-bathroom home on a 0.14 acre lot. (Def's Ex H.) Comparable #2 was built in 2004 and sold for $328,000 on September 3, 2009. (Id.) Comparable #3 was a 2,296 square foot, three-bedroom and two-bathroom home on a 0.24 acre lot. (Def's Ex I.) Comparable #3 was built in 2003 and sold for $339,900 on July 17, 2009. (Id.) Comparable #4 was a 2,354 square foot, three-bedroom *Page 5 
and two and one-half bathroom home on a 0.13 acre lot. (Def's Ex J.) Comparable #4 was built in 2005 and sold for $305,000 on October 6, 2009. (Id.) Comparable #5 was a 2,643 square foot, four-bedroom and two and one-half bathroom home on a 0.16 acre lot. (Def's Ex K.) Comparable #5 was built in 2003 and sold for $256,500 on December 30, 2010. (Id.)
Krehbiel testified that he adjusted the comparable properties' sale prices by 0.5 percent per month for time trending. (Def's Ex N.) Krehbiel testified that all of the comparables were arm's-length transactions except for Comparable #5, which like the subject property, was previously bank-owned at the time of sale. (Def's Exs K, M, N.) Krehbiel testified that he made additional adjustments to the bank owned properties to account for the 30 percent "foreclosure discount." (Def's Ex N.) Krehbiel calculated that when the time and foreclosure adjustments were applied to the subject property, the average price per square foot increased from $81 to $106, a total more in line with the comparable properties' adjusted price per square foot for non bank-owned property. (Id.) Krehbiel testified that no further adjustments were made. Krehbiel also testified that he made no inspection of the subject property nor any inspection of the comparable properties.
 II. ANALYSIS
At issue in this case is the subject property's real market value for the 2010-11 tax year. Real market value is defined in ORS 308.205(1) as:
 "[T]he amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[1]
The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007(2). There are three methods of valuation that are used to determine real market value: 1) the cost approach, 2) *Page 6 
the sales-comparison or comparable sales approach, and 3) the income approach. Allen v. Dept. of Rev., 17 OTR 248, 252 (2003). Seealso OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered although all three approaches may not be applicable to the valuation of the subject property). Because the subject property is a residence and not an income producing property, the income approach is inapplicable. Neither party considered the cost approach.
A. Comparable Sales Approach
In a case such as this, the comparable sales approach may be used to value improved properties. Appraisal Institute, The Appraisal of RealEstate 335 (12th ed 2001). The legislature requires real market value to be determined in all cases by "methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). The Department of Revenue adopted OAR 150-308.205-(A)(2)(c), stating that: "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."
Plaintiff's comparable sales approach was incomplete because none of the selected properties were "adjusted to be comparable" to the subject property. OAR 150-308.205-(A)(2)(c). Plaintiff's selected comparable properties were sold at 12, 17, and 18 months after the subject property's assessment date, providing little evidence of the subject property's real market value on the assessment date. In addition to failing to adjust for date of sale, Plaintiff made no adjustment for size, location, quality, or other distinguishing property features.
As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's real market value is incorrect on the tax roll. ORS 305.427. Plaintiff must *Page 7 
establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." Schaefer v. Dept. ofRev., TC No 4530 at 4 (July 12, 2001) (citing Feves v. Dept. ofRevenue, 4 OTR 302 (1971)).
Plaintiff must present the greater weight of evidence to support his requested real market value reduction. Plaintiff's evidence in support of his requested real market value reduction is inconclusive. When the "evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof ***." Reed v. Dept. of Rev.,310 Or 260, 265, 798 P2d 235 (1990). Plaintiff has failed to carry his burden of proof.
Even though the burden has not shifted under ORS 305.427, the court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence before the court, without regard to the value pleaded by the parties." ORS 305.412. Krehbiel presented a comparable sales approach. Krehbiel made only two adjustments to the selected comparables, a time adjustment and a 30 percent foreclosure discount adjustment for bank-owned properties as of the date of sale. Like Plaintiff, Krehbiel made no other adjustments and his evidence in support of his determined real market value is inconclusive.
B. Purchase Price
When determining real market value, the sale price of a recent, voluntary, arm's-length sale of property between a willing and knowledgeable buyer and seller is also very persuasive of real market value, albeit, not conclusive. Kem v. Dept. of Rev.,267 Or 111, 114, 514 P2d 1335 (1973). See also Sabin v. Dept. ofRev., 270 Or 422, 426-27, 528 P2d 69 (1974); Equity LandRes. v. Dept. of Rev., 268 Or 410, 415, 521 P2d 324 (1974). The two important considerations are whether or not the sale was "recent" and whether it was "arm's length." Kem, 267 Or at 114-115. *Page 8 
Plaintiff's purchase, which was negotiated in April, 2010, and closed on May 3, 2010, was close to the January 1, 2010, assessment date, making it a fairly recent sale after the assessment date.
In considering a sale, the next issue is whether the sale was an arm's-length transaction. At the time of Plaintiff's purchase, the subject property was a bank-owned property. This court has observed that:
 "property purchased through foreclosure may well involve an element of compulsion on the part of the seller. There are many practical reasons why the sale of a property following foreclosure by the lender might involve an atypical market condition rendering the transaction of little or no value as an indication of market value. For example, the lender may have a policy of selling such property only for the amount of the underlying debt, regardless of what the property may actually be worth, particularly if it would take a few months more to find a buyer willing to pay a higher price. If so, the sale, at best, likely represents the low end of the real market value range, and may have been well below the actual market value of the property." Kryl v. Lane County Assessor, TC-MD No 100192B at 6-7 (Mar 30, 2011).
In Kryl, this court gave little weight to a bank-owned property sale in which the bank sold the property within a few months after acquiring it and after a short listing period. As this court observed, a sale of bank-owned property conducted with such rapidity suggests duress or compulsion on the part of the seller, leading the court to conclude such sales as not indicative of an arm's-length transaction.
There are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value. In Ward v. Dept. of Revenue,293 Or 506, 510 n 1, 650 P2d 923 (1982), the Oregon Supreme Court observed that the Oregon Department of Revenue (Department) rules stated that:
 "[m]arket [v]alue as a basis for true cash value shall be taken to mean the highest price in terms of money which a property will bring if exposed for *Page 9 
sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing, and reasonably well-informed." OAR 150-308.205-(A)(1)(a).
While not specifically mentioning bank-owned property sales, the Department's rule offers a pragmatic and practical approach for considering atypical sales. Even though this Department rule is no longer in effect, current Department rules specify that "[w]hen nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition." OAR 150-308.205-(A)(2)(c).
A Department memorandum, dated January 21, 2009, entitled "Valid Market Sales for Oregon Assessment Purposes" states the Department's willingness to consider bank-owned property sales provided that:
 "[s]o long as the nominal standards for an acceptable comparable sale are met — arm's length, voluntary, knowledgeable parties, exposure to the market, cash equivalent, etc. — such [bank] sales are appropriate to consider. Under the market value definition standard, any sale that meets those criteria should be considered as a potential comparable." (Ptf's Rebuttal Ex 1 at 2.)
The Department's memorandum acknowledges the increase in bank-owned sales and allows for bank-owned property sales to be considered as comparable sales for the purpose of establishing real market value when those bank-owned property sales have been exposed to the open market and meet the "nominal standards for an acceptable comparable sale." (Id.).
In the case before the court, the subject property was listed for sale for almost five years. From July, 2005, until July, 2009, the subject property's owner reduced the listing *Page 10 
price 12 times, resulting in a decrease from $495,000 to $359,900. The average incremental price drop during approximately 48 months was $11,258. The subject property was a bank-owned property from July, 2009, until the date of sale in May, 2010. During those 11 months, the bank reduced the price five times, resulting in a decrease from $359,900 to $273,900. The average incremental price drop during those 11 months was $17,200. While the bank had a larger average incremental price drop than during the time the subject property was under previous ownership, the difference is not significant enough to suggest that the bank reduced the listing price for any reason other than to find a willing buyer. Additionally, the lack of any willing buyers taking advantage of these continually decreasing prices suggests the real market value of the subject property had not yet been reached until Plaintiff purchased the subject property. Plaintiff testified that he was the only individual who made an offer to purchase the subject property during the bank's nine month ownership. The distinguishing fact, specifically a five year listing period, strongly suggests that the real market price was not greater than list price for the subject property regardless of who owned the subject property. Plaintiff's purchase is persuasive evidence that will be considered in establishing the subject property's real market value.
The subject property's final list price for 2009 was $287,500 on December 17, 2009. Absent evidence to the contrary, the listing price establishes the upper real market value.Martin v. Dept. of Rev., 8 OTR 141, 147 (1979). The subject property's listing price was reduced to $273,900 on January 11, 2010. Based on the evidence presented, the court concludes that the subject property's real market value on the assessment date, January 1, 2010, was $280,000. *Page 11 
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court concludes that the best evidence of the subject property's real market value as of the assessment date was an adjusted listing price that is supported by Plaintiff's subsequent arm's-length purchase. Now, therefore,
IT IS THE DECISION OF THIS COURT that the 2010-11 real market value of property identified as Account 1652294 was $280,000.
Dated this ___ day of December 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the date ofthe Decision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanneron December 12, 2011. The Court filed and entered this documenton December 12, 2011.
[1] All references to the Oregon Revised Statutes (ORS) are to 2009. *Page 1